RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0192p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

JOHN DOE,

        *Plaintiff-Appellee*,

    *v.*

UNIVERSITY OF MICHIGAN; BOARD OF REGENTS OF THE
UNIVERSITY OF MICHIGAN; PAMELA HEATLIE; ROBERT
SELLERS; MARTIN PHILBERT; ERIK WESSEL; LAURA
BLAKE JONES; E. ROYSTER HARPER; SUZANNE
MCFADDEN; PAUL ROBINSON,

        *Defendants-Appellants*.

No. 22-1654

───────────────

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:18-cv-11776—Terrence George Berg, District Judge.

Argued:  May 5, 2023

Decided and Filed:  August 21, 2023

Before:  MOORE, CLAY, and MATHIS, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:**  Amanda K. Rice, JONES DAY, Detroit, Michigan, for Appellant.  Molly Savage, DEBORAH GORDON LAW, Bloomfield Hills, Michigan, for Appellee.  **ON BRIEF:** Amanda K. Rice, Stephen J. Cowen, Andrew J. Clopton, JONES DAY, Detroit, Michigan, Joshua W. B. Richards, Patrick F. Nugent, SAUL EWING ARNSTEIN & LEHR LLP, Philadelphia, Pennsylvania, for Appellant.  Molly Savage, Deborah L. Gordon, Elizabeth Marzotto Taylor, Sarah Gordon Thomas, DEBORAH GORDON LAW, Bloomfield Hills, Michigan, for Appellee.

————————————

**OPINION**

————————————

KAREN NELSON MOORE, Circuit Judge.   On its surface, this appeal concerns an award of attorney fees.  It presents, however, issues of ripeness, standing, and mootness that have gone unaddressed through more than five years of litigation.  John Doe was an undergraduate student at the University of Michigan ("the University") who was accused of sexual assault in 2018.  Before the University's investigation had concluded and before any discipline had been issued, he filed a lawsuit alleging that the University's disciplinary procedures for cases involving sexual assault violated his due-process rights.  The district court granted him a preliminary injunction enjoining the disciplinary process from moving forward, and the University appealed, arguing that Doe did not have standing to file his lawsuit and therefore the district court lacked subject-matter jurisdiction.  We remanded for reconsideration in light of our decision in *Doe v. Baum*, 903 F.3d 575 (6th Cir. 2018), in which we held that the University's disciplinary procedures violated due process, and in light of the University's new disciplinary policy implemented in response to that decision.  The district court granted in part and denied in part the University's motion to dismiss and granted in part Doe's motion for partial summary judgment.  The University appealed again, renewing its jurisdictional arguments.  Before the appeal could be heard, the complainant decided she no longer wished to participate in the disciplinary process.  We determined that the appeal had become moot and vacated the district court's order granting summary judgment.  Doe then moved for attorney fees, which the district court granted, and the University appealed once again.  We hold that Doe had standing to sue to seek the release of his transcript, but that the district court lacked jurisdiction over his remaining claims.  We further hold that Doe was the prevailing party only as to his due-process claim seeking the release of his transcript.  We therefore **VACATE** the district court's order and **REMAND** for recalculation of attorney fees.

# I.  BACKGROUND

When the events precipitating this lawsuit transpired, John Doe was an undergraduate student at the University of Michigan.  In March 2018, a fellow student ("the complainant") accused Doe of sexual assault.  R. 53 (Pl.'s Mot. for Partial Summ. J. at 4) (Page ID #1794).  At the time, the University had in place a policy for adjudicating claims of sexual harassment and assault that did not grant accused students a live hearing or permit them to cross-examine their accusers ("the 2018 Policy").  *Id.* at 3 (Page ID #1793); R. 47-1 (2018 Policy at 23–29) (Page ID #1391–97).  Instead, the policy required that an investigator interview both the complainant and the accused student and compile a preliminary report to which both parties could respond.  R. 47-1 (2018 Policy at 23) (Page ID #1391).  The investigator would then issue a final report containing the investigator's findings.  *Id.* at 29 (Page ID #1397).  If the investigator found a policy violation, the Office of Student Conflict Resolution ("OSCR") would then issue a sanction.  *Id.*

## A.  Investigation & Suit Filed

Doe was notified on April 2, 2018 that he was under investigation.  R. 21-1 (McFadden Decl. ¶ 5) (Page ID #386).  The investigator first met with the complainant and then invited Doe to interview.  *Id.* ¶¶ 4, 6 (Page ID #386–87).  Doe participated in the interview with the investigator, after which the investigator prepared an initial report and shared it with both parties. Doe responded to the initial report with eighty pages of feedback.  *Id.* ¶ 19 (Page ID #389). Beginning on April 19, 2018, the University placed a temporary hold on Doe's student account that prevented him from accessing his transcript while the investigation was pending.  *Doe v. Univ. of Mich.*, 325 F. Supp. 3d 821, 825 (E.D. Mich. 2018), *vacated and remanded by Doe v. Bd. of Regents of Univ. of Mich.*, Nos. 18-1870, 18-1903, 2019 WL 3501814 (6th Cir. Apr. 10, 2019).  On June 4, 2018, before the investigator issued her final report and before the University issued any discipline, John Doe filed this lawsuit.  R. 1 (Compl. at 1) (Page ID #1).  He alleged both that he *had been* denied due process because his transcript had been placed on hold and he was unable to send it to graduate schools to which he had applied and been accepted and also that he was *going to be* denied due process because his case would be adjudicated without a live hearing or the opportunity to cross-examine the complainant.  *Id.* ¶¶ 92–104 (Page ID #22–24).

He alleged that "*if* he is found to have violated the [2018 Policy] . . . his record will permanently bear that imprimatur," "*if* [his] disciplinary record and the Appeals Board report are not vacated, he will suffer irreparable harm to his reputation, as well as to his educational and career opportunities," and "*[i]f* [he] is unable to graduate from the University he will lose his significant investment of time and money in his University education." *Id.* ¶¶ 88–90 (emphasis added). He also alleged claims of gender discrimination under Title IX and the Michigan anti-discrimination statute. *Id.* ¶¶ 105–143 (Page ID #24–32).

In his complaint, Doe requested as relief, among other things, (1) "[a]n injunction . . . halting the investigation and decision-making process with regard to the [sexual assault] complaint because the process is unconstitutional and deprives Plaintiff of due process"; (2) "[a]n injunction from this Court prohibiting all Defendants from further use of the [2018 Policy] as to any student because it is unconstitutional and is a deprivation of due process rights"; and (3) "a ruling that, as a matter of law, Plaintiff's due process rights were violated." R. 1 (Compl. at 32–33) (Page ID #32–33). On June 5, 2018, Plaintiff filed a motion for a temporary restraining order and a preliminary injunction. R. 4 (Mot. for Temporary Restraining Order and Prelim. Inj.) (Page ID #133–62). Plaintiff requested as relief that the court order the University to "immediately releas[e] the 'hold' on Plaintiff's official transcript and graduation credentials; halt[] the investigation and process currently under way, which intentionally deprives Plaintiff of due process; and enjoin[] Defendants from using, for any student, the [2018 Policy] in any case where credibility is an issue." *Id.* at 3 (Page ID #135).

On June 11, 2018, the district court held a conference during which it strongly encouraged the University to release the hold on Doe's transcript. R. 20 (6/11/2018 Status Conf. Tr. at 9) (Page ID #279). The University's lawyer explained that they had offered to provide Doe with an academic transcript that included a notation that he was under a disciplinary investigation, which Doe had rejected. *Id.* at 8 (Page ID #278). The University explained that it issued transcripts in these circumstances with notations because otherwise students might transfer out of or withdraw from the University, depriving the University of its ability to issue sanctions or to complete the investigation. *Id.* at 9–10 (Page ID #279–80). The district court suggested that Doe agree to participate in the disciplinary process after leaving the University

even if he received an unmarked transcript, which he did. *Id.* The district court then explicitly asked the University's attorney, "[w]ill you recommend to your client that they should agree to [give Doe an unmarked transcript]? I know that you understand the process and I know that you understand what my position is." *Id.* at 13 (Page ID #283). The University's attorney responded that he would make that recommendation. *Id.* at 14 (Page ID #284). On June 12, the day after the status conference, the University released Doe's unmarked transcript. *Doe v. Univ. of Mich.*, 325 F. Supp. 3d at 825–26 & n.2. On June 14, having heard nothing from the parties, the district court issued an order granting in part Doe's motion for a preliminary injunction and ordering the University to release an unmarked copy of Doe's official transcript, R. 19 (Order Granting in Part Mot. for TRO & PI at 1–2) (Page ID #269–70), which it later said "reflect[ed] the parties' agreement with respect to the transcript." *Doe v. Univ. of Mich.*, 325 F. Supp. 3d at 825–26.

The district court then held a preliminary injunction hearing to consider Doe's broader challenge to the 2018 Policy. R. 29 (Prelim. Inj. Hr'g Tr. at 38–41) (Page ID #702–05). The University argued that because Doe had not yet suffered an injury, he lacked standing to challenge the 2018 Policy or, in the alternative, his claims were unripe. Either way, the University argued, the court did not have subject-matter jurisdiction over Doe's claims. *Id.*; R. 21 (Resp. to Mot. for TRO/PI at 14–16) (Page ID #323–25). The district court found that Doe's suit was ripe for review, granted the preliminary injunction, and ordered the University to provide Doe with a "live hearing" and the opportunity to cross-examine the complainant at least indirectly.[1] *Doe v. Univ. of Mich.*, 325 F. Supp. 3d at 826, 830.

## B. First Appeal

The University filed a notice of appeal and asked the district court to stay the injunction pending appeal, which it did. R. 32 (Notice of Interlocutory Appeal at 2) (Page ID #818); R. 41 (Order Granting Stay at 3) (Page ID #1262). Doe cross-appealed, arguing that he had a due-process right to direct cross-examination of the complainant. Second Br. of Plaintiff-Appellee/Cross-Appellant at 19–20, *John Doe v. Bd. of Regents of Univ. of Mich.*, Nos. 18-1870, 18-1903 (6th Cir. Apr. 10, 2019). On appeal, the University renewed its arguments that the

---

[1]The district court did not explicitly address whether Doe had standing. *Doe v. Univ. of Mich.*, 325 F. Supp. 3d at 826, 830.

district court did not have subject-matter jurisdiction. First Br. of Defendant-Appellants/Cross-Appellees at 20–33, *John Doe v. Bd. of Regents of Univ. of Mich.*, Nos. 18-1870, 18-1903 (6th Cir. Apr. 10, 2019). After the briefs were filed but before argument in Doe's case, we decided *Doe v. Baum*, 903 F.3d 575 (6th Cir. 2018), another case involving the University of Michigan and the 2018 Policy. *Baum* held that "[i]f a university is faced with competing narratives about potential misconduct, the administration must facilitate some form of cross-examination in order to satisfy due process." *Id.* at 581. After *Baum*, the University implemented an interim policy for adjudicating cases of sexual misconduct ("the Interim Policy"), which took effect in January 2019. R. 47-3 (Interim Policy) (Page ID #1426–75). The Interim Policy provided for "a hearing where warranted" and gave the hearing officer "absolute discretion to decide upon a format for the hearing," but noted that a typical hearing might include opening remarks, questions posed by the hearing officer to one or both parties, "follow-up questions by one party to the other (typically with the Respondent questioning the Claimant first); questions by the hearing officer to any witness; and follow-up questions by either party to any witness (typically with the Respondent questioning the witness first)." *Id.* at 25, 33 (Page ID #1456, 1464). In light of our decision in *Baum* and the University's changed policy, we vacated the district court's opinion and remanded for reconsideration. *Doe v. Bd. of Regents of Univ. of Mich.*, 2019 WL 3501814, at *1.

## C. Remand

Upon remand, Doe filed an amended complaint including substantially the same allegations and adding a facial challenge to the constitutionality of the Interim Policy. R. 47 (2d Am. Compl. ¶ 86) (Page ID #1342–44). The University moved to dismiss the complaint, arguing that Doe lacked Article III standing and that his claims were unripe. R. 49 (Defs. Br. in Supp. of Mot. to Dismiss 2d Am. Compl. at 8–15) (Page ID #1594–1601).[2] The University assured the district court on the record that the Interim Policy afforded Doe both a live hearing and the opportunity to cross-examine the complainant. *Id.* at 16 (Page ID #1602). Doe filed a motion

---

[2]Shortly after Doe filed his amended complaint, the district court ordered the President of the University of Michigan to appear in person at a public settlement conference. This order was the subject of a petition for a writ of mandamus, which was addressed in *In re Univ. of Mich.*, 936 F.3d 460 (6th Cir. 2019), and is not relevant to this appeal.

for partial summary judgment.  R. 53 (Pl.'s Mot. for Partial Summ. J.) (Page ID #1785–1803).  Doe asked the district court to order multiple forms of relief, though his principal requests were: (1) an order stating that the 2018 Policy violated the Due Process Clause and enjoining the University from returning to it; (2) an order requiring the University to provide him with a live hearing with the opportunity to cross-examine witnesses in front of a neutral factfinder; and (3) an order enjoining the University from placing a hold on Doe's transcript or student account under the Interim Policy or imposing a pre-hearing suspension or other penalty on Doe prior to a final adjudication under the Interim Policy.  *Id.* at 1 (Page ID #1786).  Doe argued at a subsequent hearing that the Interim Policy was vague and granted the hearing officer the discretion to permit or deny cross-examination, and thus there was a possibility that Doe would not receive the due process required by the Sixth Circuit's decision in *Baum*.  R. 82 (Mot. Hr'g Tr. at 59) (Page ID #2477).[3]

On March 23, 2020, the district court denied in part and granted in part the University's motion to dismiss and Doe's motion for partial summary judgment.  *Doe v. Univ. of Mich.*, 448 F. Supp. 3d 715, 734 (E.D. Mich. 2020).  The district court found that under the law-of-the-case doctrine, the Sixth Circuit had "impliedly" determined that the district court had jurisdiction over Doe's claim because the court of appeals did not address the University's jurisdictional arguments when remanding the case for further consideration in light of *Baum* and the Interim Policy.  *Id.* at 725.  It nevertheless assessed the University's arguments on standing and ripeness and rejected them, concluding that Doe had been deprived of a hearing and therefore he had suffered an actual and not a hypothetical injury.  *Id.*

The district court then considered and rejected the University's argument that Doe's due-process claim with respect to the 2018 Policy was moot.  *Id.* at 726.  The district court found that Doe's due-process claim was not moot because "the Sixth Circuit remanded this case for the

---

[3]On March 16, 2020, nine months after the University filed a motion to dismiss Doe's Second Amended Complaint and Doe filed a motion for partial summary judgment, the University filed another petition for a writ of mandamus, requesting that we order the district court to permit the University to move forward with the disciplinary hearing and reconsider its previous opinion in light of the University's new policy and requesting that the case be reassigned to a different district court judge.  Petition for Mandamus Relief, *In re Univ. of Mich.*, 20-1248 (6th Cir. Mar. 16, 2020).  This petition was voluntarily dismissed after the district court issued its March 23, 2020 order, and is not relevant to this appeal.

express purpose of analyzing the Interim Policy in light of recent precedent" and, in any event, the University had not satisfied its burden of showing that it was not going to "return to [its] old ways." *Id.* at 726 (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000)). The district court then determined that the University's actions violated Doe's clearly established rights, and the court denied the University defendants qualified immunity. *Id.* at 728. It found that Doe had not made plausible allegations of gender discrimination against the University and dismissed Doe's Title IX and state-law claims of gender discrimination. *Id.* at 730–31.

The district court next considered Doe's motion for partial summary judgment. *Id.* at 731. It found that the 2018 Policy had violated Doe's due-process rights because it "subjected Plaintiff to an investigation under the 2018 Policy that did not afford him a live hearing with cross-examination." *Id.* at 733. It also found that the Interim Policy was "still in need of revision for full compliance" with the requirements of due process because "the condition under which a hearing is required under the policy is vague" and because it allows the University to impose serious interim sanctions like suspensions prior to a hearing, though Doe was not subjected to a pre-hearing suspension. *Id.* at 731–33. The district court granted summary judgment to Doe on that basis. *Id.* at 733. The district court ordered that "[t]he University may proceed with its disciplinary proceedings against Plaintiff" affording Doe a live hearing and the opportunity to cross-examine witnesses and the complainant. *Id.* It entered a final judgment on March 24, 2020. R. 91 (Judgment at 1) (Page ID #2605).

**D. Second Appeal**

The University appealed, repeating its jurisdictional arguments, and in the meantime, attempted to move forward with Doe's disciplinary hearing. But by that time—nearly two years after the investigation had begun—the complainant was no longer interested in participating in the disciplinary process, and therefore the investigation was permanently closed. *Doe v. Univ. of Mich.*, No. 20-1293, 2020 WL 9171175, at *1 (6th Cir. Dec. 23, 2020) (per curiam). Doe moved to dismiss the University's appeal because it had become moot. *Id.* The University opposed the motion, arguing that there would be a dispute over attorney fees and that the University still had an interest in the outcome of the appeal. *Id.* The panel held that the appeal was moot and that

vacatur of the district court's judgment was warranted, reasoning that "[t]he defendants are not wholly responsible for Doe's case becoming moot, given that the district court required that Doe be given the opportunity to cross-examine the claimant and the claimant now declines to participate in the proceedings." *Id.* at *2. The panel also noted that vacatur of the merits decision would not necessarily disturb Doe's status as a prevailing party for the purpose of attorney fees and remanded to the district court to decide the question of attorney fees in the first instance. *Id.*

**E. Attorney Fees**

On remand, the magistrate judge issued a Report & Recommendation recommending that the district court grant in part Doe's motion for attorney fees. R. 178 (R&R on Post-Judgment Mots. at 2) (Page ID #4911). The magistrate judge dismissed the University's arguments that the district court lacked subject-matter jurisdiction, reasoning that the panel's failure to disturb the district court's finding of subject-matter jurisdiction on appeal "sp[oke] volumes." *Id.* at 7 (Page ID #4916). The University objected to the R&R, renewing its arguments that the district court lacked subject-matter jurisdiction because Doe never had Article III standing and his claims had never ripened for review, arguing that Plaintiff was not a prevailing party for the purposes of claiming attorney fees, and arguing that the fees Plaintiff claimed were not supported by contemporaneous records and the calculation of fees was therefore incorrect. R. 179 (Objections to R&R at 8, 11, 14, 15, 17, 19) (Page ID #4957, 4960, 4963, 4964, 4966, 4968).

The district court adopted the R&R. R. 183 (Order Accepting R&R at 25) (Page ID #5148). With regard to subject-matter jurisdiction, the district court concluded that if the University's jurisdictional arguments were correct, the initial Sixth Circuit panel would have been required to dismiss the entire complaint during the first appeal. *Id.* at 7–8 (Page ID #5130–31). As a result, the district court concluded that because the Sixth Circuit did not dismiss the case in its entirety and instead chose to remand for reconsideration in light of *Baum* and the Interim Policy, the Sixth Circuit instead "saw the district court as retaining subject matter jurisdiction to 'reconsider' the merits of the claims before it." *Id.* at 8 (Page ID #5131). The district court then determined that the 2020 order rejecting the University's arguments that the case had become moot "was reasonable" and declined to reconsider that conclusion. *Id.* at 10

(Page ID #5133).  The district court concluded that when the case was appealed the second time and the Sixth Circuit declared the appeal moot, the Sixth Circuit "was required to state" that there was a lack of subject-matter jurisdiction if that was true, and that "if the Sixth Circuit had thought the University was right" on its jurisdictional arguments, "it would have said so." *Id.* at 12 (Page ID #5135).  It analyzed the Sixth Circuit's determination that the appeal had become moot, noting that when making this decision, the Sixth Circuit had considered the equities. *Id.* The district court reasoned that because the Sixth Circuit stated that "defendants are not wholly responsible for [the] case becoming moot . . . [given] the claimant now declines to participate in proceedings," "the Sixth Circuit determined the claimant's refusal to participate in the hearing was the earliest relevant inflection point when mootness was presented." *Id.* at 12–13 (Page ID #5135–36).

The district court then concluded that the magistrate judge had not erred in finding that Doe's supporting documentation of attorney fees and costs were sufficient or in finding that Doe was a prevailing party for the purposes of attorney fees. *Id.* at 13–20 (Page ID #5136–43).  The University timely appealed.

## II.  JURISDICTION

This appeal concerns the award of attorney fees in *Doe v. Univ. of Mich.*, No. 2:18-cv-11776 (E.D. Mich. June 28, 2022).  We have jurisdiction over the appeal pursuant to 28 U.S.C. § 1291.

## III.  ANALYSIS

The ultimate issue presented in this case is whether the district court's grant of attorney fees to Doe is proper.  But we must consider the jurisdictional arguments as well, as "an appellate court must vacate an award of attorney's fees if the district court did not have subject matter jurisdiction over the litigation." *Lynch v. Leis*, 382 F.3d 642, 648 (6th Cir. 2004) (quoting *Greater Detroit Res. Recovery Auth. & Combustion Eng'g v. U.S. EPA*, 916 F.2d 317, 320 (6th Cir. 1990)).  The University has repeatedly pressed its jurisdictional arguments, both before this court and before the district court.

## A.  Standard of Review

We review de novo questions of subject-matter jurisdiction.  *Watson v. Cartee*, 817 F.3d 299, 302 (6th Cir. 2016).  And we review de novo the district court's determination that a party prevailed for purposes of an award of attorney fees.  *Miller v. Caudill*, 936 F.3d 442, 447–48 (6th Cir. 2019); *Tenn. State Conf. of NAACP v. Hargett*, 53 F.4th 406, 410 (6th Cir. 2022).

## B.  Law of the Case

The first question we must answer is whether the opinions in the two prior relevant appeals either implicitly or explicitly determined that the district court had subject-matter jurisdiction over Doe's claims.  "The law of the case doctrine provides that 'when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'"  *Daunt v. Benson*, 999 F.3d 299, 308 (6th Cir. 2021) (quoting *Westside Mothers v. Olszewski*, 454 F.3d 532, 538 (6th Cir. 2006)).  This "doctrine applies only to issues that were actually decided, whether explicitly or by necessary implication."  *Moody v. Mich. Gaming Control Bd.*, 871 F.3d 420, 425 (6th Cir. 2017).  We apply this doctrine "only loosely when we reconsider our own decisions," *id.* (quoting *Miller v. Maddox*, 866 F.3d 386, 390 (6th Cir. 2017)), and we do not apply it to issues not "squarely decided in an earlier appeal," *id.* (quoting *Burley v. Gagacki*, 834 F.3d 606, 618 (6th Cir. 2016)).  For prudential reasons, we generally do not reconsider issues directly addressed by a prior panel unless there are exceptional circumstances.  *Daunt*, 999 F.3d at 308.  But an exception exists for subject-matter jurisdiction. Even when a prior appellate panel has made a jurisdictional ruling, a subsequent panel may still conduct an independent assessment of jurisdiction because the "law of the case doctrine does not foreclose reconsideration of subject-matter jurisdiction."  *Amen v. City of Dearborn*, 718 F.2d 789, 793–94 (6th Cir. 1983); *see also Ohio Pub. Emps. Ret. Sys. v. Fed. Home Mortg. Corp.*, 64 F.4th 731, 734 (6th Cir. 2023).

The district court concluded that we had implicitly decided several questions in the prior appeals associated with this case.  First, the district court reasoned that the panel's silence on subject-matter jurisdiction in the first appeal, when the panel remanded for reconsideration in light of *Baum* and the Interim Policy, "strongly suggests that the Court of Appeals saw the

district court as retaining subject-matter jurisdiction to 'reconsider' the merits of the claims before it." R. 183 (Dist. Ct. Op. & Order at 8) (Page ID #5131). The district court reasoned that "[w]hen a federal court concludes that it lacks subject matter jurisdiction, the court must dismiss the complaint in its entirety," and because the panel had not done so, it indicated that the panel thought the district court did have jurisdiction. *Id.* (quoting *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006)). But in this case the panel issued only a one-page order requiring the district court to "consider the impact of *Baum* and Michigan's interim policy in the first instance." *Doe v. Bd. of Regents of Univ. of Mich.*, 2019 WL 3501814, at *1. The panel did not explicitly decide that the district court had subject-matter jurisdiction. It also did not decide that issue "by necessary implication." *Moody*, 871 F.3d at 425. The panel may well have remanded for reconsideration of the claims in light of the Interim Policy and *Baum* because these developments had the potential to moot the case and the district court was best positioned to make such a determination in the first instance. The panel's decision to vacate the district court's preliminary injunction and remand for reconsideration said nothing—explicitly or implicitly—about the district court's subject-matter jurisdiction over Doe's case.

When considering Doe's motion for attorney fees, the district court concluded that the panel that dismissed the second appeal as moot identified a particular moment at which the case became moot. R. 183 (Order Accepting R&R at 12–13) (Page ID #5135–36). The district court reasoned that when the Sixth Circuit stated that "[t]he defendants are not wholly responsible for Doe's case becoming moot, given that the district court required that Doe be given the opportunity to cross-examine the claimant and the claimant now declines to participate in the proceedings," *Doe v. Univ. of Mich.*, 2020 WL 9171175, at *2, it determined that the case had become moot at the point the claimant had declined to participate in proceedings, and no earlier. R. 183 (Order Accepting R&R at 12–13) (Page ID #5135–36).

This is not an accurate reading of the panel's 2020 order. The panel concluded that the *appeal* was moot because the claimant no longer wished to participate in the disciplinary process. *Doe v. Univ. of Mich.*, 2020 WL 9171175, at *2. But the panel was also careful to note that "[i]f a judgment is void *ab initio*, and a reversal would allow the appellant to obtain a money judgment, *a case* is not moot. But here, Defendants do not seek any monetary relief. . . . And

although a ruling on the jurisdictional issues might assist Defendants in future litigation, that does not constitute a legal interest sufficient for this appeal to proceed." *Id.* at *1 (citations omitted) (second emphasis added). We conclude that the previous panel made no determination, either implicit or explicit, about whether the district court had subject-matter jurisdiction. Its analysis of the mootness issue was confined to the mootness of *the appeal*, rather than the case as a whole, because there was an insufficient legal interest for the appeal to continue, and thus the panel lacked appellate jurisdiction. The law-of-the-case doctrine does not apply here because neither prior panel squarely addressed the jurisdictional questions, the district court erred in concluding that they did, and we are not bound by any prior determination of subject-matter jurisdiction.

## C. Justiciability Arguments

We must next address whether the district court had subject-matter jurisdiction over this case. If not, we must vacate its order granting attorney fees. *Lynch*, 382 F.3d at 648 ("[U]nless the statute under which a party seeks attorney's fees contains an independent grant of jurisdiction, an appellate court must vacate an award of attorney's fees if the district court did not have subject-matter jurisdiction over the litigation." (quoting *Greater Detroit Res. Recovery Auth. & Combustion Eng'g*, 916 F.2d at 320)).

### 1. Jurisdiction When Doe Filed His Complaint

The University has consistently argued that the district court lacked subject-matter jurisdiction from the outset of this case because (1) Doe lacked standing and (2) his claims were unripe. The doctrines of standing and ripeness both "'originate' from the same Article III limitation" of the jurisdiction of the federal courts to "'[c]ases' and '[c]ontroversies.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 & n.5 (2014) (citations omitted). And "[t]here is unquestionably some overlap between ripeness and standing." *Airline Pros. Ass'n of Int'l Bhd. of Teamsters v. Airborne, Inc.*, 332 F.3d 983, 988 (6th Cir. 2003); *see Warth v. Seldin*, 422 U.S. 490, 499 n.10 (1975) ("The standing question thus bears close affinity to questions of ripeness—whether the harm asserted has matured sufficiently to warrant judicial intervention . . . ."). Sometimes, as in this case and in *Susan B. Anthony List*, standing and ripeness "boil down to the

same question," 573 U.S. at 157 n.5 (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128 n.8 (2007)), because both the standing and ripeness questions center around whether the plaintiff suffered an injury-in-fact.  We thus address these two issues together.

In order to satisfy the requirements of Article III standing, a plaintiff must show a concrete and particularized injury-in-fact that is fairly traceable to the defendant's actions and that is likely to be redressed by a favorable decision of the court.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).  And "a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought," *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017) (quoting *Davis v. FEC*, 554 U.S. 724, 734 (2008)), because "standing is not dispensed in gross." *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996).  The University argues that Doe did not show an injury-in-fact that "is (a) concrete and particularized, and (b) 'actual or imminent, not conjectural or hypothetical.'" *Lujan*, 504 U.S. at 560 (citation omitted) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)).  "There are two potential theories of injury— 'actual' present injury and 'imminent' future injury." *Thomas More L. Ctr. v. Obama*, 651 F.3d 529, 535 (6th Cir. 2011), *abrogated on other grounds by NFIB v. Sebelius*, 567 U.S. 519 (2012). That injury must be present "not only 'at the time the complaint is filed,' but through 'all stages' of the litigation," lest the case become moot.  *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (quoting *Alvarez v. Smith*, 558 U.S. 87, 92 (2009)).  In his initial complaint, Doe alleged an "actual" present injury in the form of the deprivation of his transcript.  R. 47 (2d Am. Compl. ¶ 104) (Page ID #1349).  He also effectively alleged that he would suffer a prospective "imminent" injury of "being deprived of a hearing with the opportunity for cross examination" in the future.  Appellee Br. at 27.[4]

In order to establish that a claim is "ripe for judicial resolution, we ask two basic questions: (1) is the claim 'fit[] . . . for judicial decision' in the sense that it arises in a concrete factual context and concerns a dispute that is likely to come to pass? and (2) what is 'the hardship to the parties of withholding court consideration'?" *Warshak v. United States*, 532 F.3d 521, 525 (6th Cir. 2008) (en banc) (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 149

---

[4]Doe's initial complaint does not say this in so many words, but his later briefing before the district court and before this court makes clear that this is his position.

(1967)).  "A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'"  *Texas v. United States*, 523 U.S. 296, 300 (1998) (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580–81 (1985)).

Doe must establish standing for each remedy he sought:  an injunction ordering the issuance of his transcript and official degree, an injunction precluding the University from proceeding with the investigation and disciplinary proceedings in his case, and an injunction barring the University from applying the 2018 Policy to any student.

### a.  Standing and Ripeness of Doe's Transcript Claim

We first address Doe's standing to seek the issuance of a clean copy of his transcript. When Doe filed his initial complaint in June 2018, the University had placed an administrative hold on his account, pursuant to the 2018 Policy, and was withholding his transcript and diploma from him.  We conclude that Doe alleged a sufficiently concrete and particularized injury to support his standing to bring a claim that the University deprived him of due process by placing a transcript hold on his student account without a hearing.[5]  This claim was also ripe, because the transcript hold was imposed in April 2018.  But Doe's injury was fleeting; the University released a clean copy of his official transcript to him on June 12, 2018.

The University argues that even if Doe had standing as a result of the temporary transcript hold, this claim became moot when the University voluntarily granted him access to the transcript on June 12, 2018, two days before the district court ordered the same relief on June 14, 2018.  We disagree.  The record indicates that University did not voluntarily grant Doe access to his transcript, and therefore his claim was not moot before the district court entered its order.  The University agreed to grant Doe access to his transcript only after a status conference with the district court, during which the court expressed repeatedly that the University's attorney

---

[5]This court has never held that individuals have a general liberty or property interest in a transcript "'unmarred' by the finding of responsibility for sexual misconduct" or unmarred by a notation indicating that they are subject to a disciplinary investigation, *Doe v. Miami Univ.*, 882 F.3d 579, 598 (6th Cir. 2018), and we do not do so now.  The standing inquiry is distinct from the merits question of whether Doe actually *had* a property or liberty interest in an unmarked copy of his transcript, a question with which we are not faced here.  *Cf. Fowler v. Benson*, 924 F.3d 247, 254, 257–58 (6th Cir. 2019) (holding first that plaintiffs alleging a procedural due-process claim had standing to sue, and second that their claim failed because they did not have a protected property interest).

should recommend to his client that the University issue the transcript to Doe and that "you know my position" on the issue. In light of the district court's pressure on the University to release Doe's transcript, the University cannot fairly be said to have issued the transcript to Doe voluntarily. We conclude, therefore, that the district court had jurisdiction over Doe's due-process claim regarding the deprivation of his transcript until the parties reached an agreement that the University would release the transcript during the pendency of its investigation and the district court issued its order memorializing that agreement on June 14, 2018. R. 21-1 (Ex. 5, Emails at 1–2) (Page ID #463–64); *Doe v. Univ. of Mich.*, 325 F. Supp. 3d at 825–26. As of that date, Doe's transcript-deprivation injury had been redressed and his claim had therefore become moot.

### b. Standing and Ripeness of Doe's Remaining Claims

We next consider whether Doe had standing to seek an injunction ordering the University to "halt[] the investigation and decision-making process with regard to the . . . complaint against [him]." R. 1 (Compl. at 32) (Page ID #32). We conclude that he did not. Doe contends he had standing because his lawsuit sought injunctive relief for a risk of future harm that was "sufficiently imminent and substantial"—that harm being Doe's prospective deprivation of a hearing with the opportunity for cross-examination. Appellee Br. at 28 (quoting *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2210 (2021)). But Doe's claimed "imminent" injury was not sufficient to confer standing to sue; procedural due-process rights protect against only the deprivation of individuals' property and liberty interests without constitutionally adequate procedures. *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). The deprivation of process alone, without some concrete harm flowing from that deprivation, cannot constitute an injury that conveys standing. *See Mikel v. Quin*, 58 F.4th 252, 258 (6th Cir. 2023) ("'[A] bare procedural violation, divorced from any concrete harm,' is not a present or imminent injury . . . ." (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341–42 (2016))); *Hornbeak-Denton v. Myers*, 361 F. App'x 684, 688 (6th Cir. 2010) ("Appellants create a more fundamental problem with their due-process claim: it appears they have not been deprived of anything at all. The Fourteenth Amendment only bars deprivations 'of life, liberty, or property, without due process of law,' it does not create a freestanding right to process absent such a deprivation." (quoting U.S. Const.

amend. XIV, § 1)).**6**  And the Supreme Court has averred its "reluctan[ce] to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 413 (2013).  At the time Doe filed his complaint, he could not show that a deprivation of his liberty or property rights was imminent, because he could not show that the hearing officer would have issued a finding that he had committed the sexual assault and imposed discipline on him.  *Cf. Whitmore*, 495 U.S. at 159–60 ("It is just not possible for a litigant to prove in advance that the judicial system will lead to any particular result in his case.").  The hearing officer might well have issued a decision in his favor, after which Doe would not have faced a suspension or expulsion amounting to a deprivation of his liberty or property rights.

This ties into the ripeness problem.  The investigation and disciplinary process had not concluded when Doe filed his lawsuit.  The OSCR had not yet issued any discipline, and it was not at all clear that it would do so.  Indeed, it was perfectly possible that the investigator would find in Doe's favor and the problem Doe presented—being suspended or expelled as a result of the disciplinary investigation, without having had the opportunity to cross-examine the complainant in a live hearing—would never come to pass.  Neither the parties nor the district court had any idea whether or when a sanction would be ordered and thus "the issue [was] not fit for adjudication." *Texas*, 523 U.S. at 300.  When Doe filed his lawsuit, the injury he alleged he would face due to the University's hearing procedures was hypothetical and could not confer standing to sue for an injunction halting the investigation and disciplinary process against him.**7** For the same reasons, this claim was also unripe.

---

**6**We have held that a procedural injury is sufficient to create Article III standing when "'the procedures in question [are] designed to protect some threatened concrete interest of [plaintiff's] that is the ultimate basis of his standing,'" and "the plaintiff . . . *suffer[s] a concrete injury as a result of the disregarded procedural requirement*." *Parsons v. Dep't of Justice*, 801 F.3d 701, 712 (6th Cir. 2015) (emphasis added) (quoting *Lujan*, 504 U.S. at 573 n.8).  But *Parsons* refers to situations in which a plaintiff alleges that they had a procedural right that was disregarded and later caused them harm.  In *Parsons*, Juggalos alleged that a procedural defect in the National Gang Intelligence Center's decision to include Juggalos in a report classifying them as members of a "hybrid gang" led to reputational injury and mistreatment by law enforcement.  *Id.* at 707, 712–13.  There, the procedural defect in the NGIC's creation of the report induced concrete injuries to the Juggalos, which conferred standing to challenge the procedures.

**7**Doe contends that his case is analogous to *Fieger v. Ferry*, 471 F.3d 637 (6th Cir. 2006).  In *Fieger*, we held that an attorney had standing to challenge prospectively the Michigan Supreme Court's interpretation of its

Doe also mounted a facial challenge to the 2018 Policy as a whole. This does not rescue his lack of standing. A plaintiff must establish standing to bring facial challenges as well. *See Davis v. Colerain Township*, 51 F.4th 164, 171 (6th Cir. 2022); *see also Fieger v. Mich. Sup. Ct.*, 553 F.3d 955, 962 (6th Cir. 2009) (holding that plaintiff lacked standing to present facial challenges to the Michigan Rules of Professional Conduct). And "when a plaintiff has been injured by one part of a law, the plaintiff cannot invoke that injury to challenge other parts of the law that have done nothing to the plaintiff." *Davis*, 51 F.4th at 171. We can analogize the University's 2018 Policy to a law; Doe alleged an injury caused by the transcript-hold provision. But, as explained above, he did not allege any non-hypothetical injury he faced from the remainder of the policy. Doe therefore lacked standing to make this broad facial challenge.

### 2. Jurisdiction on Remand in 2019

The University also challenges the district court's jurisdiction after the remand from the Sixth Circuit and the filing of Doe's second amended complaint, which alleged facial challenges to both the 2018 Policy and the new Interim Policy. We consider Doe's requests for injunctive and declaratory relief separately. *Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*, 927 F.3d 396, 406 (6th Cir. 2019).

### a. Standing and Mootness: Challenges to the 2018 Policy

The district court lacked jurisdiction in 2020 to issue a declaratory judgment regarding the constitutionality of the 2018 Policy for lack of standing and mootness. For the same reasons that Doe lacked standing to challenge the hearing provisions of the 2018 Policy when his complaint was filed, he lacked standing when he filed his amended complaint. But even if Doe

---

recusal rules as violative of due process. *Id.* at 643–44. Fieger had standing because his extensive litigation history made it a near-certainty that he would face the same recusal problems before the Michigan Supreme Court as he had in the past. *Id.* This is distinct from the instant case, as the injury Fieger alleged was his inability to challenge the impartiality of a member of the Michigan Supreme Court—something that was absolutely certain to come to pass the next time he litigated before that court. Here, Doe argues that because he was actively being subjected to the University's investigation and disciplinary process it was therefore certain that he would not have had a live hearing with cross-examination. But Doe had to assert a deprivation of a liberty or property interest. And this *was* speculative, because it required: (1) the investigator to credit the complainant over Doe, (2) to make a finding in the complainant's favor, (3) to issue discipline that constituted a deprivation of a liberty or property interest, and (4) that Doe would not prevail through the University's appeals process. The hypothetical chain of events that would need to occur for Doe to sustain an injury is too long.

*did* have Article III standing to challenge his prospective deprivation of a hearing under the 2018 Policy, that dispute had become moot by the time the Sixth Circuit remanded the case. The University rescinded the 2018 Policy in response to our decision in *Baum* and instituted the Interim Policy, effective January 9, 2019. R. 82 (Mot. Hr'g Tr. at 18) (Page ID #2436). After our remand, the University argued that Doe's claims related to the 2018 Policy had been rendered moot. R. 60 (Defs. Opp. to Mot. for Partial Summ. J. at 11–14) (Page ID #1893–96). The district court incorrectly concluded that the change in the University's policy did not moot Doe's due-process claims regarding the 2018 Policy.

The party asserting mootness bears a heavy burden and must show that it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Laidlaw*, 528 U.S. at 189 (quoting *United States v. Concentrated Phosphate Export Ass'n, Inc.*, 393 U.S. 199, 203 (1968)). When considering whether challenged conduct can reasonably be expected to reoccur, we "take[] into account the totality of the circumstances surrounding the voluntary cessation, including the manner in which the cessation was executed." *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 767–68 (6th Cir. 2019). When considering the totality of the circumstances, we note that the "burden in showing mootness is lower when it is the government that has voluntarily ceased its conduct," and "'cessation of the allegedly illegal conduct by government officials has been treated with more solicitude by the courts than similar action by private parties' and that '[the government's] self-correction provides a secure foundation for a dismissal based on mootness so long as it appears genuine.'" *Id.* at 767 (quoting *Bench Billboard Co. v. City of Cincinnati*, 675 F.3d 974, 981 (6th Cir. 2012)).

Not all government action "enjoys the same degree of solicitude," and we therefore consider "the manner in which the cessation was executed" as part of our totality-of-the-circumstances analysis. *Id.* at 768. The passage of new legislation or the repeal of challenged legislation "presumptively moot[s] the case unless there are clear contraindications that the change is not genuine." *Id.* When regulatory changes are implemented with "legislative-like procedures" or "formal processes," the government "need not do much more than simply represent that it would not return to the challenged policies." *Id.* And when a change is "ad hoc, discretionary, and easily reversible" or requires little in the way of formal process, "significantly

more than the bare solicitude itself is necessary to show that the voluntary cessation moots the claim." *Id.*

In *Speech First, Inc. v. Schlissel*, 939 F.3d 756 (6th Cir. 2019), the University of Michigan was sued by a student organization challenging the University's policy prohibiting harassment and bullying as overbroad and vague. *Id.* at 761–62. After the plaintiff organization filed its complaint, the University removed the challenged definitions of bullying and harassment from its policy but continued to argue in court that those definitions did not violate the First Amendment. *Id.* at 769–70. In that case, we determined that the change was not legislative nor did it involve a legislative-like process, and therefore "the solicitude the University receive[d] is the same as any ad hoc regulatory action would. Which is to say that the solicitude does not relieve the University of much of its burden to show that the case is moot." *Id.* at 769. We considered the timing of the University's change of policy suspect and the University's continued defense of its policy in court as indicative that the University was likely to continue in the challenged conduct. *Id.* The University also refused to state affirmatively that it would not reinstate the challenged definitions in the future and could not guarantee that future administrations would not return to the challenged definitions. *Id.* Weighing those factors against the University, we determined that the University had not satisfied its burden to establish that its conduct could not reasonably be expected to reoccur. *Id.* at 770.

Just as in *Speech First*, the University has not produced any evidence that the change in its policy was legislative, and therefore solicitude toward the government's cessation alone is insufficient to establish that the case is moot. But in other respects, this case differs from *Speech First*. First, the timing here is less suspect; though the University changed its policy after the litigation began, the change was a response to our binding decision in *Baum* holding that the policy did not provide adequate process to students accused of sexual misconduct. It therefore appears less like an attempt to thwart the litigation than the policy change at issue in *Speech First*. Second, although the University's then-president publicly stated after we issued our opinion in *Baum* that "the Sixth Circuit got it wrong" and that the University "continue[d] to believe" that the best way to adjudicate sexual-misconduct cases was using the procedure that the Sixth Circuit held unconstitutional in *Baum*, R. 47 (2d Am. Compl. ¶ 84) (Page ID #1341), the

University also explicitly stated that it was "no longer contesting whether the investigative model they have used to date is sufficient, and understand[s] that [it] must provide students in Title IX cases with a live hearing including cross-examination." Defs.' Pet. for Rehr'g at 4, *Doe v. Baum*, No. 17-2213 (6th Cir. Sept. 7, 2018). The University's president also explicitly stated that the University would comply with the law as stated by the Sixth Circuit. R. 47 (2d Am. Compl. ¶ 84) (Page ID #1341). This differs from the University's behavior in *Speech First*, during which the University continued to assert in court that its definitions of bullying and harassment were constitutional and refused to disavow any intention to restore the challenged definitions to its policy.

Doe's case is more similar to an even more recent case, *Davis v. Colerain Township*, 51 F.4th 164 (6th Cir. 2022). In *Davis*, the plaintiff brought a 42 U.S.C. § 1983 action against Colerain Township, alleging that its policy of precluding "disrespectful" remarks at board meetings violated the First Amendment. 51 F.4th at 168. After the lawsuit had been filed, Colerain Township voluntarily changed the policy. *Id.* at 175. When considering whether the voluntary cessation rendered the litigation moot, we took note of the fact that just prior to the change in policy, legal counsel had informed Colerain Township about a recent Sixth Circuit decision holding that another town's restrictions on "abusive" or "antagonistic" statements at board meetings violated the First Amendment. *Id.* We concluded that Colerain Township had changed its policy in light of an external factor—recent and controlling Sixth Circuit precedent––rather than with the intent to moot and thereby thwart the plaintiff's lawsuit. *Id.* Colerain Township's conduct therefore could not reasonably have been expected to reoccur.

Here, as in *Davis*, there exists an external factor in the form of new binding precedent from the Sixth Circuit that precipitated the change in the University's policy. The courts should give to the government the same amount of solicitude when it makes a change to comply with binding precedent (even if it has done so in an ad hoc manner) as the courts give the government when it makes a change with legislative-like procedures, because in both instances it is "absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Laidlaw*, 528 U.S. at 190; *see also Thompson v. Whitmer*, No. 21-2602, 2022 WL 168395, at *4 (6th Cir. Jan. 19, 2022) (litigation was moot when state supreme court declared challenged

actions illegal and therefore, for the behavior to recur, the government would have to disregard the Michigan Supreme Court's interpretation of state law, which a court would not reasonably expect); *Midwest Inst. of Health, PLLC v. Whitmer*, Nos. 20-1611/1650, 2022 WL 304954, at \*2 (6th Cir. Feb. 2, 2022) (same); *League of Indep. Fitness Facilities & Trainers, Inc. v. Whitmer*, 843 F. App'x 707, 709–10 (6th Cir. 2021) (same). When the government has made a regulatory change in order to comply with binding precedent, the government need only represent that it does not intend to return to the previous policy. *Cf. Speech First*, 939 F.3d at 768.

The University has sufficiently shown that it changed the 2018 Policy in response to our decision in *Baum*, which held that the 2018 Policy violated the Due Process Clause because it did not provide students who had been accused of sexual misconduct with a live hearing or an opportunity to cross-examine the complainant or other witnesses before a neutral factfinder when credibility was at issue. The University's Interim Policy took effect on January 9, 2019. After the implementation of the new policy, the University assured Doe that he would receive a live hearing and cross-examination of the complainant and witnesses before a neutral factfinder. Mot. to Dismiss, Ex. B. at 1, *Doe v. Univ. of Mich.*, No. 18-1903 (6th Cir. Apr. 10, 2019). The University, through its attorneys, represented to the Sixth Circuit and to the district court that its new policy would afford Doe the right to cross-examination and a live hearing. R. 113-1 (Ex. in Support of Opp. to Mot. for Att'y Fees, Aff. of Brian Schwartz ¶ 5) (Page ID #2998); R. 82 (Motion Hr'g Tr. at 17–18) (Page ID #2435–36). And the public statement from the president of the University explicitly stated that the University would comply with the law as stated by the Sixth Circuit. R. 47 (2d Am. Compl. ¶ 84) (Page ID #1341). There was no reasonable expectation that the University would return to a policy that the Sixth Circuit had held was unconstitutional. *Cf. League of Indep. Fitness Facilities & Trainers, Inc.*, 843 F. App'x at 709–10.

Doe asserts that because the district court found that "[t]here is no dispute between the parties that Defendants' 2018 Policy denied Plaintiff a right to a hearing," *Doe v. Univ. of Mich.*, 448 F. Supp. 3d at 725, Doe was entitled to summary judgment on his facial challenge to the 2018 Policy. But that does not matter. The policy *was no longer in place* when the district court issued its order granting summary judgment to Doe on this issue, and there was no reasonable

expectation that the University would violate a court order and binding precedent by returning to the policy that we had already determined was unconstitutional. Even if Doe did have Article III standing to bring a facial challenge the 2018 Policy when he filed his complaint, this challenge was rendered moot by the replacement of the 2018 Policy with the Interim Policy, and the district court therefore lacked jurisdiction over the claim as of January 2019.

### b. Standing: Challenge to the Interim Policy

Doe also purported in his amended complaint to bring a facial challenge to the Interim Policy. But once again, Doe lacked standing. As stated above, the "irreducible constitutional minimum" of Article III standing requires a plaintiff to show that they have suffered "an injury in fact" that is "concrete and particularized" and that their injury is "fairly . . . trace[able]" to the defendant's action. *Lujan*, 504 U.S. at 560.

Doe's complaint lists several grievances with the Interim Policy: the Interim Policy allows the University to "withhold transcripts and/or a degree, to stop a student from registering for classes and to issue a suspension prior to any finding being made"; "does not expressly state that Respondents are entitled to a live hearing with the opportunity for in-person cross-examination of parties and material witnesses"; "states that the hearing officer has absolute discretion to decide on a format for the hearing"; includes an appeals process that goes to an external reviewer; does not include all of the due-process protections laid out in the University's Statement of Student Rights and Responsibilities; and uses a "preponderance of the evidence" standard of proof rather than a "clear and convincing evidence" standard. R. 47 (2d Am. Compl. ¶ 86) (Page ID #1342–44).

When Doe filed his amended complaint in May 2019, he was a graduate student at the University and the investigation into the alleged misconduct had been on hold since July 2018. No hearing had yet taken place, no final determinations of fact had yet been made, and no disciplinary sanctions had yet been issued against him. The University had neither placed a new hold on his transcript, nor prevented him from registering for classes, nor suspended him. To satisfy the injury-in-fact requirement, a plaintiff must have sustained or be in immediate danger of sustaining a direct injury. That injury must be "real and immediate," rather than "conjectural

or hypothetical." *Airline Pros. Ass'n of Int'l. Bhd. of Teamsters, Inc.*, 332 F.3d at 987 (quoting *O'Shea v. Littleton*, 414 U.S. 488, 493–94 (1974)). And "[w]ithout evidence that [the plaintiff's] predicted result is 'actual or imminent,' such an injury can only be 'conjectural or hypothetical.'" *Mich. Gas Co. v. FERC*, 115 F.3d 1266, 1270–71 (6th Cir. 1997). The alleged harm that Doe predicted he might suffer was the denial of due process by (1) possibly being denied a live hearing with cross-examination of the complainant and any witnesses, (2) possibly having his transcript or degree or the ability to register for classes withheld, or (3) possibly being suspended prior to a final adjudication—or even more distantly in the future, and (4) possibly having his appeal heard by an external reviewer after his hearing if he were found responsible. R. 47 (2d Am. Compl. ¶ 86) (Page ID #1342–44).

Doe, however, made no showing that any of these eventualities might come to pass or that he would be denied a hearing that complied with the dictates of due process under the Interim Policy. The Interim Policy allowed for the live hearing and cross-examination to which Doe was entitled under the Due Process Clause. The Interim Policy included an example of the general proceeding of a hearing, which included first questioning by the hearing officer and then "follow-up questions" by each party. R. 47-3 (Interim Policy at 33) (Page ID #1464). The University repeatedly assured Doe that he would receive the process he sought. Doe, however, objected to the lack of explicit language in the Interim Policy guaranteeing that cross-examination would be provided where credibility is at stake. R. 47 (2d Am. Compl. ¶ 86) (Page ID #1342). The district court similarly took issue with the phrasing of the University's Interim Policy. *Doe v. Univ. of Mich.*, 448 F. Supp. 3d at 733. It reasoned that the policy should be "clear in order to dispel confusion and hold their administration accountable to provide a fair process in every case." *Id.* But the University was perfectly clear in its filings before the district court as well as before this court that it understood that due process required a live hearing and cross-examination in situations in which credibility is at stake, and that Doe himself would receive a live hearing and would have the opportunity to cross-examine the complainant and witnesses.

With regard to the potential for imposing interim sanctions such as a suspension without a hearing, Doe never alleged that he was subjected to such sanctions under the Interim Policy.

Any injury is therefore merely "conjectural or hypothetical," *Mich. Gas Co.*, 115 F.3d at 1271, rather than "real and immediate," *Airline Pros. Ass'n of Int'l. Bhd. of Teamsters*, 332 F.3d at 987 (quoting *O'Shea*, 414 U.S. at 494)).

Doe contended in his motion for summary judgment that "[t]he Interim Policy continues to allow Defendants to deprive [Doe] of his property [in the form of his transcript] prior to a hearing or any adjudication of the complaint against him." R. 53 (Pl.'s Mot. for Partial Summ. J. at 12–13) (Page ID #1802–03). But Doe's transcript had been released to him almost a year earlier. R. 21-1 (Ex. 5, Emails at 1–2) (Page ID #463–64). Doe presented no facts indicating that the University was withholding his transcript when he filed his amended complaint, or that it would do so again in the future. Doe had not been injured by the Interim Policy and therefore lacked standing to assert a facial challenge.

### c. Ripeness: Challenge to the Interim Policy

Federal courts lack subject-matter jurisdiction over claims that are not yet ripe. "In ascertaining whether a claim is ripe for judicial resolution, we ask two basic questions: (1) is the claim 'fit[] . . . for judicial decision' in the sense that it arises in a concrete factual context and concerns a dispute that is likely to come to pass? and (2) what is 'the hardship to the parties of withholding court consideration'?" *Warshak*, 532 F.3d at 525 (quoting *Abbott Lab'ys*, 387 U.S. at 149). "A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Texas*, 523 U.S. at 300 (quoting *Thomas*, 473 U.S. at 580–81).

Here, the potential outcome to which Doe objected depended on a number of factors—whether the University would opt to issue a pre-hearing suspension (which it had not done initially in his case), whether the University would once again issue a pre-hearing transcript hold (which it had done initially, but had reversed), and whether it would violate binding precedent from the Sixth Circuit requiring that it provide a live hearing and cross-examination to students accused of sexual misconduct where credibility is at stake. Doe did not plead facts establishing that the harm he anticipated was at all "likely to come to pass." *Warshak*, 532 F.3d at 525. Neither the parties nor the district court had any idea whether or when a sanction would be

ordered and thus "the issue [was] not fit for adjudication." *Texas*, 523 U.S. at 300. It was "too speculative whether the problem [Doe] present[ed] [would] ever need solving." *Id.* at 302. Doe's challenge to the Interim Policy was also not ripe for adjudication and therefore should have been dismissed.

## D. Prevailing Party

When addressing attorney-fees disputes, federal courts apply the American Rule, under which each party pays its own attorney fees, unless "explicitly provided for by statute." *Planned Parenthood Sw. Oh. Region v. DeWine*, 931 F.3d 530, 538 (6th Cir. 2019). One such statute is the Civil Rights Attorney's Fee Awards Act, 42 U.S.C. § 1988, which provides for a "prevailing party" in lawsuits filed under 42 U.S.C. § 1983 to obtain attorney fees. A party is "prevailing" when it achieves a "material alteration of the legal relationship of the parties." *Sole v. Wyner*, 551 U.S. 74, 82 (2007) (quoting *Tex. State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 792–93 (1989)). In other words, the relief obtained by the party "must directly benefit the 'plaintiff by modifying the defendant's behavior toward him.'" *Tenn. State Conf. of NAACP*, 53 F.4th at 410 (quoting *McQueary v. Conway*, 614 F.3d 591, 598 (6th Cir. 2010)). The plaintiff's victory must "create a lasting change in the legal relationship between the parties." *McQueary*, 614 F.3d at 601. And the change must have been ordered by the court, rather than achieved "because the lawsuit brought about a voluntary change in the defendant's conduct." *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Hum. Res.*, 532 U.S. 598, 601 (2001); *see also Tenn State Conf. of NAACP*, 53 F.4th at 410. Except under limited circumstances, a party cannot claim to be prevailing if its success is eventually reversed or undone by the final decision in the case. *Sole*, 551 U.S. at 83.[8]

---

[8]Where the relief issued is a preliminary injunction, it must not have been "'reversed, dissolved, or otherwise undone by the final decision in the same case.'" *McQueary*, 614 F.3d at 597 (quoting *Sole*, 551 U.S. at 83). There is an exception to this general rule: "[I]f the reversal is not on the merits, it does not necessarily upset the prevailing party's status." *Green Party of Tenn. v. Hargett*, 767 F.3d 533, 552 (6th Cir. 2014). Admittedly, the vacatur of the district court's summary-judgment order in this case was not on the merits, but rather it was because an intervening change had rendered the appeal moot, and so the mere fact of reversal does not prevent Doe from being a prevailing party. It is instead the lack of jurisdiction that the district court had over Doe's claims in the first instance that is relevant to whether Doe was a prevailing party with regard to his remaining claims.

We review de novo a district court's determination of prevailing-party status under 42 U.S.C. § 1988. *Binta B. ex rel. S.A. v. Gordon*, 710 F.3d 608, 617–18 (6th Cir. 2013). The district court found that Doe was the prevailing party because he succeeded in obtaining his official transcript without notation and because the district court granted him partial summary judgment and issued an order requiring the University to give him a live hearing with cross-examination. R. 183 (Order Adopting R&R at 17–20) (Page ID #5140–43). The University's primary argument against the award of attorney fees is that the district court lacked subject-matter jurisdiction over the litigation. Appellants' Br. at 21. The University also contends that Doe is not a prevailing party for four other reasons: first, the University voluntarily released Doe's transcript in advance of the district court's order to do so; second, upon the first remand from the Sixth Circuit, the University offered Doe a live hearing with the opportunity for cross-examination long in advance of the district court's order to do so; third, a declaratory judgment that does not alter the legal relationship between the parties is insufficient to establish that one party is "prevailing"; and fourth, both of the district court's orders were vacated on appeal and therefore cannot serve as the basis for determining that Doe was a prevailing party. *Id.* at 41–44.

We hold that Doe is the prevailing party with respect to his procedural due-process claim for the withholding of his official transcript. As noted above, Doe had standing to bring his due-process claim regarding the deprivation of his transcript. The release of Doe's transcript "directly benefit[ed]" him, and thus was a material change. *McQueary*, 614 F.3d at 598 (quoting *Farrar v. Hobby*, 506 U.S. 103, 111 (1992)). The remaining question, then, is whether the University voluntarily gave Doe access to his transcript, because "[a] defendant's voluntary change in conduct . . . lacks the necessary judicial *imprimatur* on the change" to establish that a party is prevailing. *Buckhannon*, 532 U.S. at 605. The Supreme Court has explicitly disapproved the "catalyst theory," under which a plaintiff is a prevailing party if its lawsuit induces the defendant to change its conduct voluntarily. *Id.* at 601–02. It held that "enforceable judgments on the merits and court-ordered consent decrees create the 'material alteration of the legal relationship of the parties'" and thus permit an award of attorney fees. *Id.* at 604 (quoting *Tex. State Teachers Ass'n*, 489 U.S. at 792–93). So we must consider whether the University's release of Doe's transcript was voluntary or was compelled by the district court.

The record supports Doe's contention that the University did not voluntarily grant Doe access to his transcript. The parties held a status conference before the district court on June 11, 2018, at which the University's attorney noted that the University had offered to release Doe's transcript with a notation indicating that he was subject to a disciplinary investigation—an offer Doe rejected. R. 20 (Status Hr'g Tr. at 7–8) (Page ID #277–78). The district court then prompted the parties to negotiate, and Doe committed on the record to three concessions: first, he would participate in the disciplinary process even if he left the University; second, he would permit the University to convey the finding that he had committed a disciplinary violation to any future institution if found responsible; and third, he would accept the revocation of his degree as a potential sanction. *Id.* at 9–13 (Page ID #279–83). The district court then asked the University's attorney if he would

> recommend to your client that they should agree to this process? I know that you understand the process and I know that you understand what my position is. You know what plaintiff's position is. . . . I'm asking what you are going to recommend to your client. Or can you recommend it to your client? I'll put it that way.

*Id.* at 13–14 (Page ID #283–84). The court set a deadline of the following day, June 12, 2018, at noon. *Id.* at 26 (Page ID #296). The University contacted Doe on June 12th at 12:08 p.m. to inform him that the University would grant him access to his transcript, and Doe confirmed at 2:16 p.m. that he was able to access the transcript. R. 21-1 (Ex. 5, Emails at 1–2) (Page ID #463–64). On June 14, 2018, the district court issued an order stating that it "construes [the parties'] silence as stipulation to the resolution of the [transcript issue]" and granted in part Doe's motion for a temporary restraining order requiring the University to "immediately release to Plaintiff his official transcript pending resolution of this case." R. 19 (Order Granting in Part Mot. for TRO & PI at 2) (Page ID #270). The district court later stated in its order granting the TRO in its entirety that it had issued the order "to reflect the parties' agreement with respect to the transcript," which was that the University would "provide Doe with a copy of his official transcript, pending the conclusion of the [University's] investigation." *Doe v. Univ. of Mich.*, 325 F. Supp. 3d at 825–26.

*Buckhannon* explicitly stated that judgments on the merits or consent decrees satisfy the requirement that a party is prevailing. Our sibling circuits have generally agreed that the Supreme Court in *Buckhannon* was providing examples of resolutions that had sufficient "judicial imprimatur" to render one party prevailing, rather than limiting the universe of such resolutions to judgments on the merits or formal consent decrees. *See Roberson v. Giuliani*, 346 F.3d 75, 81 (2d Cir. 2003); *Aronov v. Napolitano*, 562 F.3d 84, 90 (1st Cir. 2009); *Davy v. CIA*, 456 F.3d 162, 166 (D.C. Cir. 2006) (when district court memorialized a joint stipulation in an order, making the deadlines judicially enforceable, it rendered plaintiff a prevailing party); *T.D. v. LaGrange Sch. Dist. No. 102*, 349 F.3d 469, 478 (7th Cir. 2003) (noting that some settlement agreements may confer prevailing-party status if sufficiently analogous to a consent decree); *Truesdell v. Phila. Hous. Auth.*, 290 F.3d 159, 165 (3d Cir. 2002) (order containing mandatory language and bearing the signature of the district court judge, rather than parties' counsel, was more akin to a consent decree than to a stipulated settlement, and therefore conferred prevailing party status); *Smyth v. Rivero*, 282 F.3d 268, 281 (4th Cir. 2002) (district court's failure to describe order as a consent decree was not dispositive; "[w]here a settlement agreement is embodied in a court order such that the obligation to comply with its terms is court-ordered," it is effectively a consent decree that supports prevailing-party status); *Barrios v. Cal. Interscholastic Fed'n*, 277 F.3d 1128, 1134–35 n.5 (9th Cir. 2002) (holding that a settlement agreement contained sufficient judicial oversight to confer prevailing-party status); *Am. Disability Ass'n, Inc. v. Chmielarz*, 289 F.3d 1315, 1319–20 (11th Cir. 2002) (reading *Buckhannon* to require either a consent decree or judgment on the merits is overly restrictive, and when a district court retains jurisdiction to enforce a settlement it sufficiently changes the legal relationship of the parties to confer prevailing-party status). The Sixth Circuit has at least implicitly agreed with that reasoning, noting that "a judicially sanctioned change in the parties' legal relationship, including through a consent decree, is required for prevailing party status." *Binta B.*, 710 F.3d at 623; *but cf. Toms v. Taft*, 338 F.3d 519, 529 (6th Cir. 2003) (denying prevailing-party status where settlement agreement made at a court-sponsored settlement conference with the district judge's involvement did not include judicial oversight or result in a court order altering defendants' conduct). We hold that in this case, the release of Doe's official transcript and the

subsequent order reflecting the parties' agreement on that issue is sufficient to confer prevailing-party status on Doe for that issue.

Doe directs our attention to *Perez v. Winchester County Department of Corrections*, 587 F.3d 143 (2d Cir. 2009), in which the plaintiffs obtained prevailing-party status when the court held a settlement conference and actively urged the defendants to comply with plaintiffs' request because the court felt the law was on the plaintiffs' side. *Id.* at 147. The court then issued an order memorializing the terms of the settlement. *Id.* at 150. The Second Circuit concluded that the district court's involvement and the order memorializing the terms of the settlement agreement, which made the settlement agreement judicially enforceable, was sufficient to establish the plaintiffs as prevailing parties. *Id.* at 153. Just as in *Perez*, the district court in this case played an active role in the negotiations between the parties and issued an order reflecting the parties' agreement that Doe's transcript would be released.

This case is distinct from *Toms v. Taft,* 338 F.3d 519, 529 (6th Cir. 2003). In *Toms*, the plaintiff and defendant reached a settlement agreement at a court-sponsored conference with the district judge's involvement. We held that the settlement "did not bear the necessary 'judicial imprimatur'" because "no judicial oversight was involved in enforcing the settlement, [] the district court did not issue any order altering the defendants' conduct," and the district court stated explicitly that it "did not consider its action to be a 'consent decree.'" *Id.* at 529. In this case, although the district court's order on June 14, 2018, did not alter the University's conduct because the University had already released Doe's transcript, the district court did see its order as "reflect[ing]" the agreement of the parties, and the order was styled as a judicially enforceable TRO requiring the University to release the transcript. For these reasons, this case is more like *Perez* than like *Toms*—and more like a consent decree than a mere private settlement. The relief was enduring, despite the later vacatur of the court's order, because the release of an unmarked transcript could not be undone. We conclude that Doe is the prevailing party as to the release of his unmarked transcript.

With regard to Doe's purported relief in the form of an order granting partial summary judgment to Doe on his due-process claim requesting an injunction preventing the University from proceeding with its investigation and his facial challenge to the 2018 Policy, Doe cannot be

a prevailing party because the district court never had subject-matter jurisdiction over these claims.  "If [the plaintiff] never had standing to bring the case, he is not a proper prevailing party."  *Lynch*, 382 F.3d at 646.  Doe never had standing to challenge the 2018 Policy or the Interim Policy, *see supra*, § III.C, and therefore the award of attorney fees on that basis must be vacated.  *Lynch,* 382 F.3d at 648.

We have held that when relief is enduring, even if an injunction later becomes moot, a litigant may nonetheless be a prevailing party. *Tenn. State Conf. of NAACP*, 53 F.4th at 410–11. Doe contends that the district court's summary-judgment order created enduring relief that altered the parties' legal relationship by requiring the University to provide Doe with a live hearing with cross-examination.  Appellee Br. at 22.  Not only did the district court lack jurisdiction to issue that order, but it also did not, in fact, materially alter the legal relationship between the parties.  The University had promulgated a new policy nearly a year earlier and had repeatedly asserted in court that Doe would receive a live hearing with cross-examination.  The district court's order effectuated no material change in the parties' relationship by ordering the University to do that which it had been offering to do for more than a year.  Doe's analogy to *Lefemine v. Wideman*, 568 U.S. 1 (2012) (per curiam), is inapposite.  In *Lefemine*, the plaintiff sued a police chief who stated that he would criminally sanction the plaintiff for protesting the availability of abortion with graphic signs at a busy intersection.  *Id.* at 2–3.  The district court granted the plaintiff's motion for summary judgment and enjoined the defendants from engaging in content-based restrictions on the plaintiff's signs, *id.* at 3.  The Fourth Circuit held that the plaintiff was not a prevailing party because the court "merely 'ordered [d]efendants to comply with the law and safeguard [the plaintiff's] constitutional rights in the future.'"  *Id.* at 3–4 (quoting *Lefemine v. Wideman*, 672 F.3d 292, 302–03 (4th Cir. 2012)).  The Supreme Court reversed the Fourth Circuit because "[b]efore the ruling, the police intended to stop [the plaintiff] from protesting with his signs; after the ruling, the police could not prevent him from demonstrating in that manner."  *Id.* at 5.  Here, by contrast, there is no evidence that after *Baum* and the implementation of the Interim Policy the University intended to deprive Doe of his due-process rights.  The University represented to Doe on the record before the district court and in its briefing before the Sixth Circuit that, if permitted, it intended to give Doe the live hearing with cross-examination that he had requested.  R. 113-1 (Ex. C Aff. of Brian Schwartz in Supp.

of Opp. to Mot. for Att'y Fees ¶ 5) (Page ID #2998) (stating University would provide Doe with a live hearing with cross-examination); Mot. to Dismiss, Ex. B at 1, *Doe v. Univ. of Mich.*, No. 18-1903 (6th Cir. Apr. 10, 2019) (same). Even if the district court did have jurisdiction over Doe's claims, its 2020 summary-judgment order cannot be said to have changed the parties' legal relationship in light of this critical fact. Doe is not a prevailing party with respect to either of these claims.

## IV. CONCLUSION

Doe only had one claim for which he had Article III standing and that was ripe for adjudication: a denial-of-due-process claim for his withheld transcript. After he obtained his transcript, that claim became moot. The district court lacked jurisdiction over his remaining claims because Doe lacked standing to bring those claims, they were unripe, or they were moot. Doe was therefore the prevailing party only with respect to his due-process claim for his withheld transcript, which was resolved within two weeks of his filing this lawsuit. For these reasons, we **VACATE** the district court's order granting attorney fees and **REMAND** for recalculation of attorney fees, taking into account Doe's very limited success in this lengthy litigation.